## THE STEAM-BOAT DELAWARE.

*(District Court, S. D. New York.   January 19, 1881.)*

ADMIRALTY — COLLISION — FERRY-BOAT APPROACHING SLIP—TOW— NEGLIGENCE—NINETEENTH RULE OF NAVIGATION—LIGHTS.

Where a steam-tug, with a tow on her starboard side, was moving slowly down the Hudson river on the Jersey side, a short distance above the Pavonia ferry, about 3 o'clock A. M., the night being clear and the weather fine, with lights indicating that she had a tow, and before reaching the ferry noticed the steam ferry-boat D., while on her trip from New York to Jersey City, heading diagonally across and up the river and across the stern of the tow, and not yet having reached that point in her course at which she turned in towards the ferry-slip, whereupon the tug blew one whistle to the ferry-boat to indicate that she would pass to the right of the D., across her bows, which signal the ferry-boat did not observe or respond to, but continued on her course at full speed, and turned towards the ferry slip as if to cross the bow of the tug, which was then closely approaching the mouth of the ferry slip, whereupon the tug, observing her movements, immediately reversed and backed at full speed, and when the ferry-boat was about 600 feet from the mouth of the slip she gave to the tug a signal of two whistles, which the tug did not reply to, but continued to back, and the ferry-boat, continuing on her course into the slip without slowing or backing for the tug, but slowing and backing to prevent her striking too violently against the ferry racks, and as she passed the tug came in collision with and injured the canal-boat in tow of the tug:

*Held,* that the D. was in fault in not noticing and responding to the signal of the tug, in not keeping a good lookout and observing that the tug was proceeding down the river, and in not keeping out of the way of the tug after she brought the tug and tow on her starboard hand.

*Held,* immaterial that the tug was at the time moving very slowly, her movement being such that it could have been observed from the ferry-boat, and her lights showing that she had a tow.

*The Narragansett,* 4 FED. REP. 244.

*Held, also,* immaterial that the tug and tow were moving down very near the ends of the piers.

*Also held,* that even if the tug was in fault, and if such fault contributed to the collision, the owner of the canal-boat could recover his full damages against the ferry-boat.

*The Atlas,* 93 U. S. 302.

In Admiralty.

*W. R. Beebe,* for libellant.

*S. Hanford,* for claimant.

CHOATE, D. J. This is a suit to recover damages sustained by the libellant's canal-boat, the H. B. Moore, resulting from a collision with the steam-boat Delaware, on the thirtieth day of July, 1879. The Delaware is a large side-wheel steam ferry-boat, of the Pavonia line, and was on her trip from New York to the Pavonia ferry, Jersey City, and the collision took place just off the mouth of the ferry slip, on the Jersey City side, a little after 3 o'clock in the morning. The weather was fine and clear, and lights could be plainly seen. The libellant's canal-boat and another canal-boat, the Gibbes, both loaded with wheat, were taken in tow by the steam-tug Mississquoi at the grain dock, or pier No. 8, which is about 800 feet to the northward of the ferry slip in Jersey City. Both the canal-boats were made fast on the starboard side of the tug. The tug having made the Gibbes fast along-side got a line on the H. B. Moore and hauled her out into the river, and there made her fast along-side the Gibbes. The Gibbes projected forward of the tug, and the H. B. Moore a little forward of the Gibbes. The tug backed out and up the river in getting the H. B. Moore along-side. The canal-boats were bound for the Cunard dock, on the Jersey side of the river, below the ferry, and before the tug got straightened down the river she had drifted a short distance down stream. The tide was ebb along the docks on the Jersey shore, but the current was very slight. After getting straightened down the tug started down the river.

The testimony on the part of the libellant is that after getting started down the river under two bells, and when they had attained a speed of two or three miles an hour, the pilot of the tug saw the ferry-boat coming across the river heading about for the tug—that is, to the northward of the ferry slip to which she was bound; that the tug gave her one whistle to indicate that she would pass to the right of the ferry-boat—that is, cross her bow before the ferry-boat entered her slip. The testimony on both sides is that as the tide was that morning, in her usual course from slip to slip, before the ferry-boat gets headed for her slip she does head further to the northward, pointing about north-west, and afterwards, and as she approaches her

slip, heads in directly for it, or about west. The testimony of her pilot and lookout was that she took such a course on this trip, and that they did not notice the lights of the tug at all till the ferry-boat got directly headed for the slip, and they say at a distance of about 600 feet outside of it. There is a great weight of testimony in support of the claim of the tug that before the ferry-boat reached this point the tug gave her a single whistle. The testimony on the part of the libellant is conflicting as to whether the Delaware answered the one whistle of the tug with a single whistle. The pilot and one of the deck hands of the tug testify that she did. Other witnesses on the part of the libellant testify that she did not, or at least that they heard no reply. The witnesses from the ferry-boat testify that she did not give the tug a single whistle. Upon the whole, I think the weight of the evidence is that she neither noticed the one whistle of the tug nor answered it, nor at the time the tug whistled had seen her lights, although they were plainly in sight and had moved slowly down from pier 8.

This is in substance the effect of the testimony of the pilot and lookout of the ferry-boat, and I think it extremely improbable that if she had answered the tug's signal with a single whistle she would, in direct violation of that signal, have immediately headed across the bow of the tug, and attempted to run into the slip ahead of her. The pilot and deck-hand of the tug must therefore be mistaken. A long time elapsed between the occurence and the giving of their testimony, and their recollection may well have been at fault on this point, or they may have heard something at the time which they mistook for an answering whistle. Almost immediately after the tug gave her one whistle, her pilot observed that the ferry-boat was swinging to the west and heading for her slip, and still coming on at full speed. She was running at a speed of about 10 miles an hour. The pilot of the tug immediately rung to slow, stop, and back the tug, and she was backing at the time of the collision, and her headway by the land was nearly stopped. It was after the

ferry-boat got thus headed for her slip, and when she was, as her pilot and lookout say, about 600 feet outside of her slip, that she discovered the tug, whose headway by that time had been considerably checked, and the ferry-boat gave a signal of two whistles, indicating that she was going into her slip ahead of the tug. The pilot of the ferry-boat testifies that when he discovered her he thought she was not in motion. The tug made no response, but continued to back at full speed. It clearly was the duty of the ferry-boat, in this situation, to give way to the tug. She had the tug on her starboard hand, and their courses were crossing so as to involve risk of collision, (nineteenth rule for avoiding collisions.) It is no excuse for her to say that she took the tug to be standing still, and not in motion. It was a gross fault and negligence that she had not before seen her, and observed that she was coming down the river. Her two vertical lights indicated that she had a tow. It is immaterial that the tug was moving very slowly. *The Narragansett,* 4 FED. REP. 244. It was impossible for the tug, by backing, to keep clear of the course of the ferry-boat into the slip. The signal came too late, and she was already backing to avoid a collision. The ferry-boat having given the two whistles kept on at full speed for some distance without waiting for a response, and her pilot only discovered that the tug was in motion when she had got very close to the tug, and it was too late, perhaps, to avoid a collision. She did not in any respect alter her movements in approaching her slip in consequence of the tug being there. She slowed and backed before she got to the bridge, but it was because it was usual for her to do so, not to avert the impending collision. It is very clear that she was in fault in not giving way to the tug, having her on the starboard hand, in giving her a signal she could not comply with, and then without waiting for an answer in going ahead at full speed as if the tug would or could comply. A great deal of testimony has been taken as to the distance the tug was from the ends of the piers. It is wholly immaterial, except as affecting the credibility of witnesses, and of the

least possible importance in that respect since the judgment of witnesses as to distance on the water, especially at night, is notoriously untrustworthy.

From the circumstance that the libellant's canal-boat, when struck on the port bow by the guard of the ferry-boat forward of the wheel and torn from the tow, was carried into the slip against the center pin, I think it is very probable that she was running nearer the piers than the witnesses of the libellant testify. Whatever her distance from the pier, however, the ferry-boat had her lights in full view, and should have observed them and governed herself accordingly. If the tug was nearer to the piers than was prudent, it did not contribute to cause the collision, because she was in full view of the ferry-boat, and even if this had been a fault which contributed to cause the collision it would not relieve the ferry-boat from liability. *The Atlas*, 93 U. S. 302. The same is true of the stopping of the tug, if that was a fault which contributed to the collision. An attempt was made on the part of the libellant to show that the pilot of the ferry-boat, who, as such pilot, was examined on the trial, was not in fact at her wheel at the time of the collision. The evidence relied on was an alleged admission to that effect to another witness in conversation. I am satisfied that he must have been misunderstood by this witness, and that in fact he was at the wheel.

Decree for libellant, with costs and reference to compute damages.